Filed 10/15/14  P. v. Lucas CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MYRON LEE LUCAS and JERMAINE BUSH,<br><br>    Defendants and Appellants. | G049915, G049918<br><br>(Super. Ct. No. RIF10002552)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Riverside County, Michael B. Donner, Judge.  Affirmed as to Defendant and Appellant Myron Lee Lucas. Affirmed as modified as to Defendant and Appellant Jermaine Bush.

Melissa Hill, under appointment by the Court of Appeal, for Defendant and Appellant Myron Lee Lucas.

Mark L. Christiansen, under appointment by the Court of Appeal for Defendant and Appellant Jermaine Bush.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Steve Oetting and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

The second amended information charged defendant Myron Lee Lucas with 10 counts of kidnap for robbery (Pen. Code,[1] § 209, subd. (b)(1); counts one through 10) with a firearm use enhancement (§ 12022.53, subd. (b)) in connection with each count; one count of dissuading a witness (§ 136.1, subd. (c)(1); count 11) with a firearm use enhancement (§ 12022.5, subd. (a)); and one count of burglary (§ 459) with a firearm use enhancement (§ 12022.53, subd. b)). It also alleged Lucas served a prior term in state prison. (§ 667.5, subd. (b).) Defendant Jermaine Bush was charged with 10 counts of kidnapping (§ 207, subd. (a); counts 12 through 21) with a firearm use enhancement (§ 12022.53, subd. (b)) in connection with each count; one count of assault with a firearm (§ 245, subd. (a)(2); count 22) with a firearm use enhancement (§ 12022.5, subd. (a)); and one count of residential burglary (§ 459; count 23) with a firearm use enhancement (§ 12022.53, subd. (b)). The information alleged a person other than an accomplice was present at the time of the burglary, (§ 667.5, subd. (c)(21)), that Bush served two prior separate terms in state prison, and had previously been convicted three times of serious felonies (§ 667, subd. (a)(1)), which also qualify as prior strikes under the "Three Strikes" law (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(A)).

The jury convicted the defendants on all counts and found the firearm enhancements true. The trial on Bush's prior conviction allegations was bifurcated from the trial on the substantive offenses. Bush waived his right to a jury trial on the priors. The court found Bush served two prior terms in state prison and suffered three prior serious felony and prior "strike" convictions. The court sentenced Bush to an indeterminate sentence of 250 years to life, plus a consecutive determinate term of 103 years.

---

[1] All undesignated statutory references are to the Penal Code.

The court sentenced Lucas to life on count one, plus a consecutive determinate term of 10 years. The sentences imposed on the remaining counts were stayed pursuant to section 654.

Defendants allege an assortment of prejudicial errors, none of which are convincing. We conclude, however, the trial court erred in sentencing Bush by imposing two consecutive five-year terms under section 667, subdivision (a)(1), for prior serious felony convictions arising out of the same case and which were not brought and tried separately as required by law. We therefore order Bush's abstract of judgment amended and otherwise affirm the judgments.

I

PROCEDURE AND FACTS

Although the defendants were jointly tried in this matter, two juries were used. The day before jury selection was scheduled and immediately after his *Marsden*[2] motion to relieve counsel was denied, Bush filed a request to proceed in propria persona. He said he wanted to represent himself because he was not being properly represented by counsel. Bush indicated he would not be ready to start trial the next day if the court granted him self-representation. The court found Bush's request was untimely and denied the request.

On May 26, 2010, Leticia Villarreal was at her residence on a ranch with stables, horses, and pigs in Mira Loma, in Riverside County. There were a number of people living there. In addition to Villarreal, two of her children (ages two and 11), Cecilia Romero, and Romero's daughter also lived there.

On the same day, Romero and her daughter went to the store. Ramiro Martinez, Alicia Pardo, and their baby were at Villarreal's residence that day. Villarreal went by the corrals to talk to Pardo and to see Pardo's baby. Villarreal's two children

_____

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

3

were with her.  A male Villarreal referred to as Jose, "the mechanic," was also present, fixing a vehicle on the property.[3]

At approximately 1:00 p.m., a black Mercedes arrived and parked.  Bush and Lucas got out of the car.  Each had a gun.  One of the witnesses described the guns as being "like bluish" another said Bush's gun was black.  Other witnesses said the guns appeared to be nine-millimeter semiautomatic pistols.

Villarreal told her daughter to go inside the house and call 911.  Her daughter went inside and got the telephone, but gave it to Romero when Romero and her daughter entered the residence after returning from the store, apparently unaware of what was transpiring outside.  Villarreal's daughter told Romero what was happening.  Romero looked out a window and called the police.

Bush told everyone to get down.  As Bush approached Martinez, he asked Martinez if he knew "Poncho."  Martinez ran and Bush gave chase, telling Martinez not to run or he'd be shot.  Bush caught Martinez, placed handcuffs on him, and walked him back to the house.  Meanwhile, Lucas walked to Torres who was working on a car on the property.  Lucas punched Torres, and while Torres was on the ground, Lucas threatened him with a pistol.

When Bush got to the house with Martinez, he knocked on the front door. When no one answered, Bush kicked in the door.  Romero, her daughter, and Villarreal's daughter left the house through the back door.  Romero had the telephone to her ear. Lucas pointed his pistol at Romero and told her to put the telephone down.  Romero complied.  Bush and Martinez left the house and went back to the others.  Bush asked Villarreal who lived in the house.  With pistol in hand, Bush demanded that everyone go inside the house, about 50 to 60 feet away.

---

[3] Bush testified the mechanic was Jose Torres.  We will refer to him as Torres for ease of reading.

4

As they were going into the house, another car arrived. Two males got out of the vehicle and Bush called them over to where he was. The two males were directed into the house and their hands were tied behind their backs with plastic ties.

When Lucas attempted to tie up Torres, Torres moved quickly and said something indicating he did not want to be tied or was not involved in what was going on. Bush told Torres, "Don't talk to me or else," and pulled back the slide on the pistol. Villarreal heard a click when Bush pulled back the slide.

Bush appeared nervous and repeatedly asked about "Poncho," stating Poncho owed him money. Villarreal said they did not know Poncho. Bush looked around the house for photographs of Poncho

Bush asked the two late-arriving males whether they were related to Martinez. He then asked them what they would do if he caused pain to Martinez. Bush told Martinez he would see how much pain Martinez could take. The women started screaming the children should not be present for that. Bush let the women and children go into the kitchen and told them they should not look if they hear anything. Once Bush returned to the living room, he said to Martinez, "Let's see how much pain you can take."

Bush told Lucas to bring the car around, and said they were going to take Martinez with them. Bush told the others, "If I find out you know Poncho or anything, I'm going to come back, and I'm going to kill all of you guys."

Lucas went outside, moved the Mercedes to the front of the house, turning it to face the street. He opened the trunk and appeared to be looking inside of it for something. When he returned, he told Bush the police were coming. Bush and Lucas left the house. They got to the Mercedes, looked in the direction of the sheriff deputies and "took off running." The defendants had been in the house for approximately 30 minutes. They did not take any property or money from their captives.

The Mercedes was searched and a two or three-foot-long bag with an 18-inch diameter was found on the front passenger's seat. Over Bush's hearsay objection,

Riverside Deputy Sheriff Brett Johnson testified he contacted the registered owner of the Mercedes and was told the bag had not been in the vehicle when he had lent the vehicle.

An investigative technician lifted Bush's fingerprints from the exterior of the driver's door. Bush's wallet was found along the path the defendants ran from the house.

When Lucas was interrogated by police, he said the plan—set up by "a Mexican dude"—was to go into the house and seize "a lot of" marijuana and cocaine. Lucas said Bush gave him a gun to use. Lucas denied knowing the bag was in the Mercedes. He said he punched the "the Mexican guy" who went "crazy." Lucas also said he threw away the gun he used.

*Defense Evidence*

Jorge Gonzalez is an auto mechanic and has a shop in San Bernardino. Bush had a towing business in the shop next door to Gonzalez, and towed vehicles for a number of Gonzalez's customers. Gonzalez said he has a number of BB guns and pellet guns that look like real guns. He said one looks like a Colt .45 and another "looks similar to a smaller handgun, maybe similar to a .380." Gonzales said both have the appearance of being semiautomatic. He said he kept them in one of his desk drawers in his shop. Around the date of the incident, Gonzalez had five or six BB guns and pellet guns in his shop, and he was away from the shop for a little over a month on military duty. About a month and a half to two months after he returned from reserve duty he noticed two of the weapons were missing. Gonzalez told an investigator from the public defender's office one was missing. Gonzalez added that Bush had access to his shop.

Bush's counsel sought to preclude the prosecution from impeaching Bush's testimony with his prior convictions from 1993 for assault with a firearm and robberies, as well as his 2002 convictions for a number of robberies and assault with a firearm. Defense counsel argued the prior convictions were too remote in time to be relevant and

6

asserted it would be highly prejudicial to admit evidence of all Bush's convictions. Although the court agreed evidence of the prior convictions was "highly prejudicial," the court found them "very germane to the case at hand" and held evidence of each of the convictions could be admitted.

Bush testified in his defense. He said he saw Gonzalez's BB guns and pellet guns in Gonzalez's shop. Bush said a friend of his, Jose Torres, was a mechanic and used to work for him. Torres contacted Bush at his shop on May 26, 2010. Bush said Torres was the mechanic that was at Villarreal's residence that day. Later that day, Bush went to Villarreal's residence with Lucas to "fake a robbery." He explained the reason for the fake robbery: Torres had been deported and kept in touch with Bush. According to Bush, Torres got involved with drug runners who helped pay for Torres to come back into the country. Bush said the drug dealer was Martinez, who had testified earlier. Torres asked Bush for help. Torres wanted to stop dealing drugs with Martinez. Bush devised a plan. He would loan Torres $3,000. At Villarreal's residence, Torres would tell Martinez there was a customer who wanted to make an initial purchase of a small amount of drugs. After doing so, Torres would signal Bush to enter. Bush would then go in, handcuff and zip tie Torres's hands and feet, and take the money back. Once Bush left, Torres would blame Martinez for what happened, which appears was hoped would end the drug-dealing relationship between Martinez and Torres.

Bush said he saw Martinez and Torres together a number of times, including once when Bush sold Martinez a Mazda. According to Bush, Martinez said he did not have cash for the vehicle, but had something Bush could hold. Martinez showed him two packages containing a white substance wrapped in some sort of waxy film. Bush said he did not want to hold the packages, but he would sell the vehicle on Martinez's promise to pay.

7

Bush said Lucas was at his shop when Torres called and Bush decided to take Lucas along. Bush told Lucas the plan and said he wanted Lucas to watch his back. He explained that Torres was in on it.

According to Bush, the guns they used were fake and he got them from Gonzalez's shop. He said he gave Lucas a BB gun and Lucas "should have known" the gun was fake. Later, he said he was sure he told Lucas the gun was not real. Rounding up all the people on the property and herding them into the house was not part of the plan. Bush said he did not know there would be women and children present.

Bush said he borrowed the Mercedes from Avila Sanchez, a friend of his. He admitted driving the black Mercedes to Villarreal's residence and parking on the side of the road. Torres went down the long driveway toward the house. They texted back and forth about the situation. After awhile, Torres called and told Bush he was on the property, working on a truck, and said Bush should make his entrance. Torres told Bush that Martinez was present with his girlfriend and newborn baby.

Bush stated Lucas hit Torres because Lucas tied up the other males and skipped Torres. Bush thought that showed favoritism toward Torres. When Bush asked Lucas what he was doing leaving Torres untied, Lucas started to respond that Torres was Bush's friend, at which point Torres "jumped up" saying he had nothing to do with Bush. At that point the women asked to take the children in the next room.

II

DISCUSSION

A. *Common Issue*

Defendants separately make a number of challenges to their convictions. Before addressing those, we turn to an instructional issue raised by both defendants.

The firearm use enhancements provided in sections 12022.5 and 12022.53 attach to the use of real firearms, but not toy guns or BB guns. (*People v. Law* (2011) 195 CalApp.4th 976, 982-983.) Defendants contend the trial court erred in instructing the

8

jury as follows: "A person's conduct and words in using an object that looks like a gun may constitute sufficient circumstantial evidence to support a finding that it was a firearm."

Defendants did not object to the instruction requested by the prosecutor. The Attorney General argues the failure to object forfeited the issue on appeal. We find the instruction affected defendants' substantial rights and the failure to object does not preclude them from raising the issue here. (*People v. Valdez* (2012) 55 Cal.4th 82, 151.)

The language in the instruction appears to have been inspired by the opinion in *People v. Monjares* (2008) 164 Cal.App.4th 1432, 1437. In *Monjares*, the defendant lifted his shirt during a robbery, revealing the handle of a black pistol. The jury convicted him of the robbery and found he personally used a firearm in the commission of the robbery. (*Id*. at p. 1434.) On appeal he contended the evidence did not support the true finding because the victim could not say whether the pistol in defendant's waistband was real, fake, or a toy. (*Id.* at p. 1435.)

The issue in *Monjares* was whether the evidence supported the jury finding defendant used a firearm in the commission of the robbery. (*People v. Monjares*, *supra*, 164 Cal.App.4th at p. 1435.) The appellate court noted the nature of a weapon as a real firearm may be established by circumstantial evidence alone, or in conjunction with direct evidence. (*Id*. at pp. 1435-1436.) In finding the jury was not required to give the defendant the benefit of the doubt of the victim's inability to conclusively state the item that looked like a gun given it was used to make the victim think it was a real gun, the court stated a "'defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a [firearm].' [Citation.]" (*Id*. at pp. 1436-1437.) The court recognized it was "conceivable" the pistol was a toy, but the jury was entitled to rely on defendant's conduct that the pistol was real, loaded, and the defendant would have shot had the victim not complied with his demand. "Simply stated, when as here a defendant commits a robbery by displaying an object that looks

9

like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt, as a matter of law, that the gun was a firearm. [Citation.]" (*Id*. at pp. 1437-1438, fn. omitted.)

In *People v. Hunter* (2011) 202 Cal.App.4th 261, the only issue at trial was whether the defendant used a real firearm in committing the charged offenses. The defendant and a cohort robbed a branch bank located inside a supermarket. The cohort slammed a gun on the counter, pointing it at the tellers, and the defendant lifted his shirt to show the gun he had in his waistband. (*Id*. at p. 264.) Witnesses testified the defendant's gun appeared to be real. (*Id*. at 265.) The only reference in the trial to a fake gun had to do with the gun used by the defendant's cohort. When the defendant was finally arrested almost 18 months after the crimes, he said during his interrogation his cohort's gun was "like an antique" and he (the defendant) did not "'even know if it was a toy or what.'" (*Id*. at pp. 265-266.)

Over the defendant's objection (*People v. Hunter*, *supra*, 202 Cal.App.4th at p. 264), the trial court in *Hunter* gave the following pinpoint instruction to the jury: "'"When a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm.'" (*Id*. at p. 267.)

The *Hunter* court found the first sentence of the instruction was not only unduly argumentative (*People v. Hunter*, *supra*, 202 Cal.App.4th at p. 275), it also violated the Fifth Amendment by lightening the prosecution's burden of proving every element beyond a reasonable doubt (*id*. at p. 276). The court concluded that although the

instruction did not direct the jury to find the firearm use enhancement true, it "did highlight this one aspect of the evidence as not necessarily creating a reasonable doubt, thereby permitting the jurors to interpret the instruction as a caution against finding a reasonable doubt on this basis. This impermissibly alleviated the district attorney's need to persuade the trier of fact that the gun used in the robbery was a real one, . . . ." (*Ibid*.)[4]

The court further noted section 1096a declares that when a jury is instructed on the issue of reasonable doubt, no other instruction on the issue need be given. (*People v. Hunter*, *supra*, 202 Cal.App.4th at p. 276.) CALCRIM No. 220 contains the reasonable doubt standard instruction. The Bench Notes to this instruction state "[a] defendant is entitled, on request, to a nonargumentative instruction that directs attention to the defendant's theory of the case and relates to the state's burden of proof," citing (*People v. Sears* (1970) 2 Cal.3d 180, 190.) The Bench Notes say nothing about the court issuing a pinpoint instruction at the prosecutor's request and highlighting evidence that would support a guilty verdict or a true finding on an enhancement allegation.

The present instruction did not direct the jury to find the firearm use allegation true. (*People v. Hunter*, *supra*, 202 Cal.App.4th at p. 268.) Neither did it inform the jury a "'victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm,'" as the instruction in *Hunter* did. (*Id*. at p. 267.) Assuming the instruction was erroneous, it was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Hunter*, *supra*, 202 Cal.App.4th at p. 278.)

_____

[4] Although the manner in which a weapon is used may very well demonstrate the nature of the weapon and although fake firearms are not used nearly as often as real firearms, when an individual uses a fake gun in an crime—either because he does not have access to a real gun or because he seeks to reduce the risk of injury to the victim—the fake gun will likely be utilized in a manner so as to attempt to convince the victim it is real, i.e., by pointing it at the victim and threatening to shoot the victim unless demands are met.

A number of witnesses testified the weapons looked real. One also said she heard a click from Bush's gun when he pulled back the slide on the weapon. Bush and Lucas certainly acted as if the weapons were firearms. Additionally, it seems highly unlikely that Bush, knowing he was going to meet a drug dealer he thought might be armed and dangerous, would take a fake gun to a potential gun fight. Granted, even an armed drug dealer might not attempt to use a weapon if he believed Bush had the drop on him with a real gun. But if the dealer saw Bush and Lucas approaching before they got the drop on him and he decided to start shooting—as Bush must have understood was a possibility—Bush and Lucas would be in a worse position than one who takes a knife to a gun fight.

Because we addressed the issue of whether it was error to instruct the jury in this manner and have concluded any error was harmless, we need not consider whether counsel was ineffective in failing to object to the instruction.

B. *Issues Raised by Bush*

 1. *Self-Representation*

Bush contends the trial court erred in denying his request to waive his right to counsel and to represent himself at trial. If the trial court erred in denying a defendant the right of self-representation, the error is structural and requires reversal. (*U.S. v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149, citing *McKaskle v. Wiggins* (1984) 465 U.S. 168, 177-178, fn. 8.)

The United States Supreme Court explained a defendant's right of self-representation in *Faretta v. California* (1975) 422 U.S. 806. There, the high court noted "the Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense with a lawyer's help.'" (*Id.* at p. 814.) "'[A]n accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently

12

waive his Constitutional right to assistance of counsel.' [Citation.]" (*Ibid.*) Furthermore, "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." (*Id.* at p. 817.)

"'"[I]n order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an *unequivocal* assertion of that right within a reasonable time prior to the commencement of trial."' [Citations.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1107; see also *People v. Lynch* (2010) 50 Cal.4th 693, 721 [voluntary, knowing, and intelligent request by a competent defendant must be granted when made within a reasonable time prior to trial].) When a request is untimely, however, the court has discretion to grant or deny the request. (*People v. Lynch*, *supra*, 50 Cal.4th at p. 722.) A request for self-representation is untimely when made the day before jury selection is set to begin. (*People v. Valdez* (2004) 32 Cal.4th 73, 102.) "'[A] defendant should not be permitted to wait until the day preceding trial before he moves to represent himself and requests a continuance in order to prepare for trial without some showing of reasonable cause for the lateness of the request. In such a case the motion for self-representation is addressed to the sound discretion of the trial court . . . .' [Citation.]" (*Ibid*.) By imposing a timeliness requirement on a request for self-representation, a defendant is prevented "'from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. [Citation.] If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay.' [Citation.]" (*Ibid*.)

When exercising its discretion in connection with an untimely request for self-representation, a trial court should consider a number of factors, including the "quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People v. Windham* (1977) 19 Cal.3d 121, 128.) Because Bush's

13

request to represent himself occurred the day before jury selection, his request was untimely. (*Ibid.*) We review the trial court's decision denying Bush's untimely request to represent himself for an abuse of discretion. (*People v. Johnson* (2012) 53 Cal.4th 519, 531.)

Applying the *Windham* factors it becomes readily apparent the trial court did not abuse its discretion in denying defendant's untimely motion to represent himself. First, Bush had established his proclivity to substitute counsel. He was originally represented by counsel when he was arraigned on the felony complaint. When he appeared for trial on an earlier trial date, February 28, 2011, he made a request to discharge his attorney so he could represent himself. That request was granted. Months later, when the matter was again in court for trial, Bush requested he be permitted to forego representing himself and to have retained counsel represent him. The court permitted the substitution. Nearly a year later, when the matter was again in court for trial, Bush indicated his dissatisfaction with retained counsel. The court relieved counsel and appointed yet another attorney to represent Bush. Now Bush was once again seeking to change the status of his representation at the time of trial.

Second, and in connection with the quality of counsel's representation, the court denied Bush's *Marsden* motion to have counsel relieved. At a minimum in denying the motion, the court impliedly found counsel was not ineffective. The court also noted Bush was represented by experienced counsel with over 70 trials to verdict—from driving under the influence to homicide—and who, along with the other attorneys on the case, was ready to begin the trial.

Moreover, the court found Bush's request was based on his belief he was not receiving effective assistance of counsel and out of frustration with the court's ruling denying his *Marsden* motion earlier that day. Additionally, although all counsel had answered ready for trial, Bush said he would not be ready to begin trial if he were permitted to represent himself. That would have disrupted the proceedings in a two-year-

old case, requiring not only subpoenaing of witnesses but also requiring Bush's codefendant, Lucas, to continue to remain in jail awaiting trial. All these reasons support the trial court's decision to deny Bush's untimely request for self-representation. (*People v. Windham, supra*, 19 Cal.3d at p. 128.) Accordingly, we conclude Bush failed to demonstrate the trial court abused its discretion in denying his untimely request to represent himself in this matter again.[5]

## 2. *Prosecutorial Misconduct*

"[O]n claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution. With respect to the latter, conduct by the prosecutor constitutes prosecutorial misconduct only if it "'"'so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process.'"'" [Citations.] By contrast, our state law considers it misconduct when a prosecutor uses "'"'deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'" [Citations.] . . . 'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law, however, 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071.)

Bush claims the following statement in the prosecutor's argument to the jury constituted misconduct: "And the truth of the matter is, had it not been for Jane Doe [No.] 1, sneaking inside that house and telling Cecilia Romero about what was happening outside, I may not be here arguing for multiple counts of kidnapping, the assault and burglary. I might be here arguing for homicide." Defense counsel objected, but the court overruled the objection, stating, "It's argument."

---

[5] Because we find the trial court did not abuse its discretion in denying Bush's untimely request for self-representation, we need not determine whether Bush's request, made on the heels of the denial of his *Marsden* motion, was unequivocal.

The Attorney General contends Bush forfeited this argument by failing to request the court to admonish the jury in connection with the prosecutor's argument. When an objection to improper argument has been sustained, counsel must request the jury be admonished concerning the impropriety to preserve the issue for appeal. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) But when the court overrules the objection, a defendant has no occasion or opportunity to request an admonition and the issue has not been forfeited, because such a request in that situation would have been futile. (*People v. Redd* (2010) 48 Cal.4th 691, 745.) Having just overruled the objection, a court would not then admonish the jury that the argument was improper. An admonition is given when the trial judge finds misconduct has occurred. (*People v. Bolton* (1979) 23 Cal.3d 208, 215-216, fn. 5.) The failure to request an admonition to the jury when the objection has been overruled does not forfeit the issue on appeal.

According to Bush, the prosecutor's argument was improper because it expressed the prosecutor's personal opinion that a killing would have occurred but for the call to 911, and/or the statement denied Bush his right to confront witnesses against him. We find no error. A prosecutor has wide latitude in arguing to the jury. This wide latitude includes reasonable inferences and deductions from the evidence. (*People v. Ward* (2005) 36 Cal.4th 186, 215.) Here, Bush threatened to shoot victims and stated his intent to torture one of the males in an effort to obtain information. He told the women and children who were in the kitchen, not to enter living room regardless of what they may hear. The prosecutor's statement that the victims' situation could have been much worse because someone could have gotten killed had the 911 call not been made, causing the sheriff's deputies to arrive on the scene, was not misconduct.

The statement did not imply the prosecutor had out-of-court information the jury did not have. Neither did it appear to express the prosecutor's personal opinion that Bush was likely to be a killer. Rather, the isolated statement merely expressed the fortuity of the 911 call having been made where the opportunity to make good on the

16

threats to shoot and torture was cut short by the timely arrival of law enforcement. Although we do not condone such an argument because the issue for the jury was whether the *charged* offenses had been proven, not what charges might have been made had the situation not ended as it did, we do not find the argument to be misconduct.

Even were we to assume the statement was misconduct, it would be harmless under both the federal and state standards. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) The complained of statement was isolated, the court informed the jury it was only argument and instructed the jury that argument of the attorneys is not evidence. The prosecutor never followed up on the isolated statement, and urged conviction based on the facts before the jury.

Bush also claims the prosecutor committed misconduct in cross-examining him. During cross-examination, the prosecutor asked Bush, "So, you've had two years to think about what you were going to say today?" Defense counsel objected to the question as argumentative. The court overruled the objection.

The question was argumentative, as it was designed to engage Bush in an argument (*People v. Mayfield* (1997) 14 Cal.4th 668, 755), rather than to determine the facts within his knowledge, as evidenced by Bush's immediate response to the question: "Are you calling me a liar?" At which point the prosecutor answered, "You tell me. Are you lying?" Defense counsel again objected. Although the court did not rule on the objection, it broke up the argument between the prosecutor and Bush: "THE COURT: Excuse me, gentlemen. Stop." Still, the two argumentative questions do not require reversal under any standard of prejudice. There is no reason to believe these two questions affected the outcome of the trial. (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236.)

3. *Evidentiary Issues*

Bush argues the trial court erred in permitting him to be impeached with his prior convictions because the court did not exercise its discretion to exclude the evidence

17

under Evidence Code section 352 (evidence more prejudicial than probative). He contends the failure resulted in the admission of propensity evidence.

Prior to Bush testifying, his counsel sought to preclude the prosecution from impeaching Bush's testimony with his prior convictions from 1993 for assault with a firearm and robberies, as well as his 2002 convictions for five robberies and three counts of an assault with a firearm. Defense counsel argued the prior convictions were too remote in time to be relevant. He also asserted it would be highly prejudicial to admit evidence of all the convictions. Although the court agreed evidence of the prior convictions was "highly prejudicial," the court found them "very germane to the case at hand" and held evidence of each of the convictions could be admitted. As a result, the court permitted Bush to be impeached with a conviction for assault with a firearm and three convictions for robbery on February 10, 1993, as well as three convictions for assault with a firearm and five convictions for robbery on October 15, 2002. In an effort to take the sting out of the jury hearing about Bush's numerous prior convictions, his attorney introduced evidence of the prior convictions on direct examination.

"Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding." (Cal. Const., art. I, § 28, subd. (f)(4).) Although that provision states prior felony convictions may be used without limitations, the courts have found evidence of prior convictions is subject to the court's discretion under Evidence Code section 352. (*People v. Hinton* (2006) 37 Cal.4th 839, 887, citing *People v. Collins* (1986) 42 Cal.3d 378, 389; see also Cal. Const., art. I, § 28, subd. (f)(2) ["[n]othing in this section shall affect . . . Evidence Code section 352"].) Thus, a trial court has discretion to exclude evidence of a defendant's prior felony conviction "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid Code, §

18

352.)  In exercising its discretion whether to admit evidence of a defendant's prior felony convictions under Evidence Code section 352, "the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense . . . ." (*People v. Clark* (2011) 52 Cal.4th 856, 931.)

We review a trial court's decision to admit evidence of a defendant's prior felony convictions for an abuse of discretion.  (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 121.)  The court's discretion is broad enough "'to deal with the great variety of factual situations in which the issue arises.'"  (*People v. Hinton*, *supra*, 37 Cal.4th at p. 887.)  For us to find the trial court abused its broad discretion, "'"the resulting injury [must be] sufficiently grave to manifest a miscarriage of justice.  [Citation.]  In other words, . . . the court [must] exceed[] the bounds of reason, all of the circumstances being considered." [Citation.]  In most instances the appellate courts will uphold the exercise of discretion even if another court might have ruled otherwise.'  [Citations.]  '"The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon mechanically automatic rules. . . ." [Citation.]'  [Citation.]"  (*People v. Ardoin*, *supra*, 196 Cal.App.4th at p. 121.)

The 1993 convictions could be characterized as remote, but their age alone does not automatically render evidence of the convictions inadmissible for impeachment purposes.  (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)  Theft-related crimes, including robbery, are probative of a witness's credibility.  (*Ibid*.)  While remoteness generally lessens the probative value of a prior conviction (*ibid*.), this case presents a well-recognized exception.  Although Bush's first group of assault with a firearm and robbery convictions occurred on February 1993, and there were more than nine years between those convictions and his subsequent convictions in 2002, he spent more than six of those nine years in prison on the 1993 convictions, and was paroled in 1998.  He again committed a number of robberies and assaults with a firearm within a few years of being

19

paroled, resulting in a 12-year prison sentence for the assault with a firearm and robbery convictions. Bush made parole on the second prison commitment on May 1, 2006, and committed the instant offenses four years later.

Because Bush did not remain free of felonious conduct outside of prison for more than five years between his first and second set of robberies, and just four years after being paroled from his second state prison commitment and was back before the court on another set of felony charges, his prior convictions for assault with a firearm and robbery are not remote. The fact that Bush's 2002 convictions were probative on the issue of his credibility "mitigates in favor of admission of the" 1993 convictions as well. (*People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 926.) Bush's prior robbery convictions were relevant to the issue of his credibility.

While theft-related offenses were very probative of Bush's honesty or veracity (*People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 925), crimes of violence are less so (*People v. Burns* (1987) 189 Cal.App.3d 734, 738). Bush contends the trial court's decision permitting him to be impeached with all the robbery and assault with a firearm convictions was overkill. He argues that as he was charged with assault with a firearm in the present case, introducing evidence of his prior convictions for assault with a firearm was cumulative, misleading, confusing, and was likely to lead to speculation. He asserts the court should have permitted him to be impeached with but one robbery count from each of 1993 and 2002 convictions. He cites no authority for that proposition and we have found none.

The court did not err in permitting Bush to be impeached with a number of robbery convictions. Had the court permitted him to be impeached with only one robbery conviction in each case, a jury might have thought those were but two aberrations in an otherwise lawfully compliant life. The admission of the assault with a deadly weapon convictions in addition to the multiple robbery charges presents a more difficult issue.

20

There are at least four factors a court should consider in determining whether to permit a defendant to be impeached with a particular felony conviction. In exercising its discretion to admit a particular conviction for impeachment of a defendant, the court should consider "(1) whether the [conduct] reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of [the conduct]; (3) whether [the conduct] is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of the impeachment by prior convictions. [Citation.]" (*People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 925.) We note initially that of the four factors, remoteness and the effect on Bush's decision to testify are not a concern. We have already found Bush's convictions were not too remote. Additionally, he testified, so we need not be concerned with the fourth factor listed in *Mendoza*.

Turning to the remaining two factors, assault with a deadly weapon is a crime involving moral turpitude. Consequently, such a conviction is available for impeachment purposes. (*People v. Hinton*, *supra*, 37 Cal.4th at p. 888.) As our Supreme Court noted in *People v. Barrick* (1982) 33 Cal.3d 115, 122-123, however, crimes of violence are less probative of honesty and veracity than theft related offenses. Given defendant's robbery convictions were held admissible for impeachment purposes and the limited relevance of a violent felony on the issue of veracity or honesty, there was little, if any, need to introduce his additional convictions for assault with a firearm.

Moreover, Bush was charged with assault with a firearm in the present case. The court apparently thought that fact made evidence of his prior convictions for assault with a deadly weapon even more relevant. The court stated the fact that Bush was charged with "the exact same types of crime" made his prior convictions "very germane to the case." While such an analysis may be appropriate in the context of admitting evidence of other crimes pursuant to Evidence Code sections 1108 [evidence of other sexual offenses admissible where defendant charged with a sexual offense] and 1109

21

[evidence of other domestic violence where defendant charged with domestic violaence], in order to demonstrate a defendant's propensity to commit the charged crimes, it is not appropriate where the defendant is charged with the same type of crime as the prior conviction sought to be introduced to solely for impeachment purposes. (See *People v. Clark*, *supra*, 52 Cal.4th at p. 932 [similarity between charged offense and prior conviction is factor that may be cause to exclude the prior conviction, but the similarity is not dispositive].) The decision allowing Bush to be impeached with prior convictions for assault with a deadly weapon, when he was charged with the same offense in the present case and the court had already ruled he could be impeached with a number of robbery convictions, was overkill and an abuse of discretion.

The error does not, however, require reversal. Bush's testimony was thoroughly impeached with his numerous robbery convictions. Additionally, his testimony was not credible. He testified he went to the property in order to fake a robbery in which he was to "steal" $3,000 he lent Torres for purposes of the fake robbery. Although the defendants were purportedly present in order to take back Bush's money and thereby permit Torres to blame the drug dealer for the robbery, allowing Torres to stop his involvement with the drug dealer, Bush did not take any money from anyone at the residence. Rather than commit a fake robbery against Torres, Bush spent his efforts attempting to find out who Poncho was. Therefore, no miscarriage of justice occurred. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

As stated above, Bush's counsel asked him about his prior convictions in an obvious attempt to lessen the sting of the revelation. During that line of questioning, counsel asked Bush why he pled guilty in 2002 to five robberies and three assaults with a firearm. The court sustained the prosecutor's relevancy objection. Bush contends this was prejudicial error. We review a trial court's evidentiary ruling for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.)

There are any number of reasons a defendant may decide to plead guilty that have nothing to do with the issue of a defendant's veracity when testifying in a subsequent matter. For example, one may plead guilty because the amount of time offered in exchange for a guilty plea is much less than one would expect would be imposed after a trial, or a defendant may plead guilty in exchange for the dismissal of other charges. In the hearing on Bush's *Faretta* motion prior to the taking of any evidence, Bush informed the court he represented himself on the 2002 case and pled guilty because the district attorney agreed to dismiss the strike allegation(s), which meant he would be entitled to accrue two-for-one custody credits and would not have to serve a minimum of 85 percent of the sentence, which he would have to do if it was found he had suffered a prior "strike" conviction. Bush said that without a "strike" attached to those offenses, the offer "was almost [a] time served deal." That Bush decided to plead guilty for those reasons was irrelevant to the issue of Bush's impeachment.

Before asking Bush why he pled guilty in the 2002 case, defense counsel asked him if he had pled guilty to five counts of robbery in that case. Bush said he did. Counsel then asked him if he was "also convicted of three counts of [violating] Penal Code section 245[, subdivision] (a)(2), assault with a firearm on that day as well?" Bush said he had, and added, "All of them are true. Whatever my co-defendants did, I had to take. Whatever they do, tied me up to it." The prosecutor's motion to strike Bush's additional comments was granted because they were nonresponsive to the question of whether he had been convicted of three counts of assault with a firearm. This stricken response does not mean Bush's *reason* for pleading guilty to the assaults, as well as the robberies, was because he had been an aider and abetter. This is especially true given the fact Bush had already informed the court during the *Faretta* hearing why he pled guilty to the offenses in 2002. Consequently, the court did not err in excluding from evidence the reason Bush decided to plead guilty in the 2002 case.

23

4. *Cumulative Error*

Bush contends the cumulative effect of the errors he alleges require reversal. We disagree. We found three possible errors: instructing the jury in connection with the firearm use enhancement, permitting Bush to be impeached with assault with firearm convictions and the prosecutor asking but two argumentative questions in cross-examining Bush. Even taken together these errors do not require reversal. There was substantial evidence Bush used a real firearm. (See *infra*.) Bush was *thoroughly* impeached with his robbery convictions. The two improper questions were isolated, the court stopped the exchange, subsequently instructed the jury that questions are not evidence, and the prosecutor did not exploit his error in argument.

5. *Sufficiency of the Evidence: Firearm Enhancements*

Bush next contends the evidence did not support the true findings on the firearm use enhancements. He argues this is so because the evidence only established the weapons *looked* like firearms, given he testified the weapons were BB guns. We disagree.

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Thus, the only "relevant question is whether, after viewing the evidence in the

24

light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.]" (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6.) Thus, our power "'begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted which will support the conclusions reached by the trial court [citation]. All evidence most favorable to respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].'" (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549.) "The standard of review is the same when the prosecution relies mainly on circumstantial evidence. [Citation.]" (*People v. Valdez*, *supra*, 32 Cal.4th at p. 104.)

As defendant points out, the firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (b)) require the use of a real firearm. (*People v. Monjares*, *supra*, 164 Cal.App.4th at p. 1435.) The evidence in this matter supports the firearm use enhancements, Bush's testimony that his weapon was a BB gun notwithstanding. Witnesses testified the defendants had guns. Some said the pistols appeared to be nine-millimeter semiautomatics. Bush used his weapon as if it was a real firearm, including pulling the slide back to load a round into the chamber. And as we already discussed, "when as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm within the meaning of section 12022.53, subdivision (b)." (*People v. Monjares*, *supra*, 164 Cal.App.4th at p. 1437.)

Substantial evidence of a firearm use enhancement does not require either the defendant to have fired the weapon or the police to have recovered the weapon and determined it was a real firearm. If a murder can be established without a body having

been found (see *People v.* Sapp (2003) 31 Cal.4th 240, 259-260), there is no reason to conclude a firearm use enhancement requires the firearm to have been found.

>    6. *Serious Felony Enhancements*

Although a defendant may acquire multiple "strike" prior convictions in a single trial (*People v. Superior Court* (*Arevalos*) (1996) 41 Cal.App.4th 908, 915-916), the same is not true for five-year prior conviction enhancements pursuant to section 667, subdivision (a)(1). "[A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges *brought and tried separately*." (§ 667, subd. (a)(1), italics added.) According to the information, two of defendant's three alleged serious felony prior convictions occurred on October 15, 2002.

In an effort to establish the alleged prior conviction allegations, the prosecutor introduced two prison packets. (§ 969b.) One of the packets related to Bush's convictions in case No. FSB022358. That packet involved a number of October 15, 2002 convictions for robbery. Because the record indicates two of Bush's serious felony convictions for robbery occurred on the same date, in the same case, and there is no evidence the charges were brought and tried separately, the trial court erred by finding two prior serious felony convictions occurred on October 15, 2002, and in imposing separate five-year enhancements on each. We therefore order the abstract of judgment amended, striking one of the five-year terms based on Bush's October 15, 2002 convictions for robbery and imposed pursuant to section 667, subdivision (a)(1).

C. *Issues Raised by Lucas*

>    1. *Confrontation*

Detective Brett Johnson testified in the People's case-in-chief. He had the owner of the Mercedes respond to the station and asked him what items in the Mercedes

were present when he loaned the vehicle. Johnson testified the owner said a large bag in the Mercedes had not been there when he loaned the vehicle. Defense counsel objected that the owner's statement was hearsay. (Evid. Code, § 1200.) The prosecutor urged admission of the statement "[f]or the purpose of the investigation." The court then overruled the defense's objection.

The statement from the owner had no relevance other than for its truth. The Attorney General concedes as much. (See *People v. Scalzi* (1981) 126 Cal.App.3d 901 [officer's state of mind was irrelevant].) Lucas, however, now claims admission of the statement of the owner of the Mercedes violated his Sixth Amendment right to confrontation.

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) In *Crawford v. Washington* (2004) 541 U.S. 36, the Supreme Court held the confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Id.* at pp. 53-54.) The *Crawford* court did not delineate the limits of what constitutes testimonial hearsay. "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Id.* at p. 68, fn. omitted.) The court used "the term 'interrogation' in its colloquial, rather than any technical legal, sense," and included statements made "in response to structured police questioning." (*Id.* at p. 53, fn. 4.) Although the high court has still not spelled out a comprehensive definition of *testimonial*, in *Davis v. Washington* (2006) 547 U.S. 813, 821, the court clarified that only "'testimonial statements'" implicate a defendant's Sixth Amendment right of confrontation. Even then, the confrontation clause "does not bar the use of

27

testimonial statements for purposes other than establishing the truth of the matter asserted. [Citation.]" (*Id.* at p. 59, fn. 9.) Statements made to law enforcement officials in response to questioning "are not testimonial if given and taken for nonevidentiary purposes such as the need to cope with ongoing emergencies. [Citation.]" (*People v Cage* (2007) 40 Cal.4th 965, 987.)

Defense counsel's hearsay objection did not preserve the confrontation issue for appeal. (*People v. Redd*, *supra*, 48 Cal.4th at p. 730.) Even if we were to conclude the issue was preserved, any error would have been harmless beyond a reasonable doubt. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.) During Lucas's interrogation—the tape was played for the jury—a deputy asked Lucas about the bag found in the Mercedes and Lucas said he did not know why the bag was there. The bag was found on the front passenger seat, so Lucas must have known of its presence whether the bag had been in Mercedes when it was lent, or not. Moreover if, as Lucas said during questioning, they expected 100 to 1,000 pounds of drugs to be at the house, it would be reasonable to expect they would have brought something in which to carry away the loot.

As the Attorney General points out, the fact that the owner of the Mercedes said the bag had not been in the Mercedes when he lent the vehicle, does not mean Lucas (or even Bush) put the bag in the vehicle. This evidence negates any prejudicial effect from the court's admission of the Mercedes owner's statement concerning the bag having not been in the vehicle when he loaned the vehicle. Additionally, the court instructed the jury that certain evidence was admitted for a limited purpose—in this instance to explain the investigation—and not to be considered for any other purpose. We presume the jury complied with the court's instruction. (*People v. Fuiava* (2012) 53 Cal.4th 622, 716.)

2. *Jury Instruction*

The crime of kidnapping for purpose of robbery (§ 209, subd. (b)(1)) applies only "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that

28

necessarily present in, the intended [robbery]." (§ 209, subd. (b)(2).) In this matter, the court instructed the jury pursuant to CALCRIM No. 1203 on the elements of kidnapping for purpose of robbery. That instruction included statements that the prosecution must prove the defendant used force or fear in moving a person over a substantial distance—a substantial distance is more than a slight or trivial distance—and the movement must have been "beyond that merely incidental to the commission of a robbery." The instruction also informed the jury how to determine whether a purported victim was moved a substantial distance.

When the court reviewed proposed jury instructions with counsel, the court stated its intent to give the complained of special instruction—"unnecessary movement in a kidnap for robbery is not an incidental movement"—if Lucas's counsel was going to argue the movement of the alleged victims was incidental to the robbery. Counsel objected to the instruction as surplusage and argued the movement of the victims was not substantial. Lucas contends the giving of this instruction constituted prejudicial error.

The instruction is a proper statement of the law. (*People v. Leavel* (2012) 203 Cal.App.4th 823, 835; *People v. James* (2007) 148 Cal.App.4th 446, 455, fn. 6.) Unlike the challenged instruction pertaining to a defendant's use of a weapon that looks like a real firearm (*post*), the present instruction was not argumentative. At worst it was unnecessary. (See *People v. Hughes* (2002) 27 Cal.4th 287, 379 [failing to define "merely incidental" not error absent indication the jury needed the phrase defined].) The jury was instructed pursuant to CALCRIM No. 1203 (kidnapping for robbery) that the substantial distance a victim must be moved is "a distance beyond that merely incidental to the commission of a robbery." The instruction did not adversely affect the jury's decision as to whether the movement of the victims was incidental to a robbery. The jury still had to determine whether moving the victims from outside to inside the residence 50 to 60 feet away was incidental to the planned robbery. Additionally, the jury had to determine whether the movement increased the risk of harm to the victims over and

29

above the risk necessarily present in the intended robbery.  (*People v. Delgado* (2013) 56 Cal.4th 480, 487.)

In *People v. Martinez* (1999) 20 Cal.4th 225, 237, our Supreme Court concluded the jury should consider the totality of the circumstances "in determining whether the movement "'is substantial in character.'"'"  "Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes."  (*Ibid.*, fn. omitted.)  Lucas contends the present instruction negated the totality of the circumstances test.  We disagree.

There are two related aspects to the movement required by section 209. First, the movement must not be incidental to the robbery.  (*People v. Leavel*, *supra*, 203 Cal.App.4th at p. 835; § 209, subd. (b)(2).)  Second, the movement must "increase[] the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."  (§ 209, subd. (b)(2).)  The objected to instruction had nothing to do with whether the distance the victims were forced to move qualified as incidental to the intended robbery.  The jury still had to determine whether the movement was necessary, i.e., incidental, to the intended robbery.  Even if the jury found the movement of the victims was unnecessary to commit the robbery, and thus not incidental to the robbery, it still could not convict Lucas of kidnapping for robbery without also finding the movement increased the risk of harm to the victims.  (§ 209, subd. (b)(2) [kidnap for robbery provision only applies "if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense"].)

We conclude the court did not err in so instructing the jury.

30

III

DISPOSITION

The judgment as to Lucas is affirmed. The true finding on one of Bush's two section 667, subdivision (a)(1) serious felony prior convictions from October 15, 2002, is reversed and the abstract of judgment is ordered amended to reflect the imposition of two, not three, five-year terms pursuant to section 667, subdivision (a)(1).[6] A certified copy of Bush's amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment as to Bush is affirmed.



MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

---

[6] We note the abstract of judgment indicates Bush was convicted of kidnapping in counts 22 and 23, and the court stayed the sentence on those counts pursuant to section 654. If this is in error—the jury's verdicts indicate it found Bush guilty of assault with a firearm and burglary in counts 22 and 23 respectively, and the court stated it would stay the sentence on those offenses—the court may correct the abstract to reflect the convictions for assault with a firearm and burglary. (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

31